NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210208-U

NO. 4-21-0208

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* C.R., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|      Petitioner-Appellee, | ) | No. 18JA100 |
|      v. | ) | |
| Carrie S., | ) | Honorable |
| | ) | J. Brian Goldrick, |
|      Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's best-interest finding
terminating respondent's parental rights was not against the manifest weight of
the evidence.

¶ 2    On March 16, 2021, the trial court terminated the parental rights of respondent,

Carrie S., as to her child, C.R. (born August 28, 2017). Respondent father, Cody R., is not a

party to this appeal. On appeal, respondent argues the trial court's best interest finding

terminating her parental rights was against the manifest weight of the evidence. For the

following reasons, we affirm.

¶ 3                  I. BACKGROUND

¶ 4                  A. Initial Proceedings

¶ 5    In September 2018, the State filed a petition for adjudication of wardship, alleging

the minor's environment was injurious to his welfare where respondent and respondent father

had unresolved issues of (1) alcohol or substance abuse and (2) domestic violence or anger management (705 ILCS 405/2-3(1)(b) (West 2016)).  The petition further alleged G.W. (born March 6, 2006) was neglected for the same reasons.  Subsequently, the trial court granted the Department of Children and Family Services (DCFS) temporary custody and guardianship of C.R.

¶ 6            In December 2018, the trial court entered an adjudicatory order finding C.R. neglected.  Prior to entry of the order, respondent stipulated to paragraph 4(B) of the petition for adjudication of wardship alleging the environment was injurious to C.R.'s welfare due to respondent's unresolved issues of domestic violence or anger management.  In a January 2019 dispositional order, the trial court (1) found respondent unfit, (2) made C.R. a ward of the court, and (3) granted DCFS guardianship and custody.

¶ 7                                B. Termination Proceedings

¶ 8            In March 2021, the State filed an amended petition to terminate respondent's parental rights.  The petition alleged respondent failed to (1) make reasonable efforts to correct the conditions that were the basis for the removal of C.R. from her within nine months after adjudication, specifically December 4, 2018, to September 4, 2019, and December 30, 2019, to September 30, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) make reasonable progress toward the return of C.R. within nine months after adjudication, specifically December 4, 2018, to September 4, 2019, and December 30, 2019, to September 30, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 9                                1. *Fitness Hearing*

¶ 10           On March 10, 2021, the trial court conducted a bifurcated hearing on the petitions for termination of parental rights, first considering respondent's fitness.  At the hearing,

respondent stipulated she failed to make reasonable progress towards the return of C.R. within nine months after adjudication, specifically December 30, 2019, to September 30, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2016)). Based on respondent's stipulation and an extensive factual basis offered by the State, the court found respondent unfit by clear and convincing evidence.

¶ 11                                      2. *Best-Interest Hearing*

¶ 12          In March 2021, the trial court held a best-interest hearing where the court heard testimony and received best-interest reports from the court appointed special advocate (CASA) and Camelot Care Centers (Camelot).

¶ 13                                      a. Amy Hood

¶ 14          Amy Hood, C.R.'s foster mother, testified she first met C.R. in August 2020 when he was placed with his grandmother. According to Hood, her husband and in-laws were from a very small town and knew C.R.'s grandmother and great-grandmother. Hood had weekly visits with C.R. from the middle of August to October 1, 2020, when he moved into her home. During that time, C.R.'s grandmother and Camelot, the agency in charge of C.R.'s case, were looking for a permanent placement for C.R.

¶ 15          According to Hood, C.R. was thriving in her home. Hood and her husband bonded with C.R. "instantly" and he called them "mommy" and "daddy." When asked about changes in C.R. since he began living in her home, Hood testified, "A lot of changes. He is now potty trained. He's ready to start talking and speaking much clearer, more words, eating healthy. Eats a wide variety of foods. He's in preschool. Learning shapes, colors, numbers. Knows all of his colors, all preschool activities, songs. Quite a few differences." C.R. also had a strong bond with extended family members who lived in the community.

¶ 16         Hood and her husband had conversations about potentially adopting C.R. and both agreed to adopt C.R. if he became free for adoption. Hood and her husband signed a permanency commitment form for Camelot. According to Hood, her brother had a relationship with C.R. through weekly family dinners. Hood testified, "My brother, who also lives here in this community, has agreed to that if something, God forbid, happens to John and I that they would take [C.R.]"

¶ 17         According to Hood, C.R.'s behavior changed following visits with respondent. Hood testified, "Either during or immediately following visits, he sometimes has accidents. He tends to act out. Sort of regress I would call it. Not talking or talking in a baby voice. Just babbling. Not actually saying words. After the last visit on February 23rd, he did not eat for almost two days." Hood opined it was in C.R.'s best interest to remain in her home.

¶ 18                         b. Respondent

¶ 19         Respondent testified she completed domestic-violence counseling in August 2020. Respondent learned about red flags and unhealthy relationships. Respondent obtained an order of protection against respondent father, and she intended to follow through to get a two-year order. In November 2019, respondent completed residential counseling for substance abuse. In May 2020, respondent completed the outpatient program. Respondent acknowledged she had relapsed over a three-day weekend prior to being admitted to the hospital for a stroke. Respondent tested positive for "amphetamines, cannabis, opiates[,] and benzodiazepine." There were questions regarding whether respondent was providing her own urine screens, so the agency wanted her to complete hair follicle tests. Respondent testified she contacted the caseworker multiple times to reschedule missed hair follicle tests but she never received a call back.

¶ 20    In November 2020, respondent had a stroke. Following the stroke, respondent required physical, occupational, and speech therapy. Respondent could walk with the aid of a walker or a gait belt, and she used a wheelchair. Respondent was willing to engage in additional substance abuse counseling and continue individual counseling. Respondent testified it was not in C.R.'s best interest to terminate her rights and she wanted some additional time so that she could fully care for him.

¶ 21                        c. The Trial Court's Findings

¶ 22    After hearing the evidence, the trial court found it was in C.R.'s best interest to terminate respondent's parental rights. The court provided a lengthy oral pronouncement where it weighed the statutory best-interest factors. Initially, the court detailed the history of the case, noting that in June 2020 the case had been ongoing for 21 months and respondent had not consistently engaged in services such that the goal could move toward a return home. In September 2020, the court changed the goal to substitute care pending a determination on the petition to terminate parental rights. At that point, respondent had failed to adequately address the safety risks of substance abuse and domestic violence. The court noted respondent's substance use in November 2020 before her stroke was not a relapse because respondent was not working a plan of recovery, she simply used again.

¶ 23    As to the factor of physical safety and welfare, the trial court found the foster placement provided food, shelter, health, and clothing to the minor. The court noted C.R. had bonded with his foster family and had negative responses when he was away from the foster placement. The court found the foster placement to be a stable, secure environment.

¶ 24    As to the development of the child's identity, the trial court stated individuals other than respondent had a hand in developing C.R.'s identity. The court noted C.R. was three

- 5 -

and a half years old and had been "allowed to be a child" during the previous six months he lived with his foster placement. As to the child's familial, cultural, and religious background and ties, the court found the factor to be neutral given C.R.'s young age. The court noted respondent clearly loved C.R. but was unable to meet his needs as well as her own needs. The court found the foster family provided the minor with love, attachment, and consistency.

¶ 25    The trial court declined to consider the child's wishes and long-term goals due to C.R.'s young age. The court found the minor's community ties to be a neutral factor based on C.R.'s age but noted that he may be developing those attachments attending preschool. The court found the risk of remaining in substitute care weighed in favor of termination because C.R. had spent two-thirds of his life in care with multiple placements. The court noted the current placement offered permanency, which supported terminating respondent's rights. Ultimately, the court found it was in C.R.'s best interest to terminate respondent's parental rights.

¶ 26    This appeal followed.

¶ 27                    II. ANALYSIS

¶ 28    On appeal, respondent argues the trial court's best interest finding terminating her parental rights was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 29                    A. Standard of Review

¶ 30    "At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination [of parental rights] is in the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). The reviewing court will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence. *Id.* A best-interest determination is against the

manifest weight of the evidence only if the facts clearly demonstrate the court should have reached the opposite result. *Id.* Ultimately, the trial court is in the best position to determine the credibility of the witnesses. *In re K.B.*, 314 Ill. App. 3d 739, 748, 732 N.E.2d 1198, 1206 (2000).

¶ 31 At the best-interest stage of termination proceedings, " 'the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.' " *In re T.A.*, 359 Ill. App. 3d 953, 959, 835 N.E.2d 908, 912 (2005) (quoting *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004)). The trial court takes into consideration the best-interest factors in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)).

¶ 32 B. Best-Interest Finding

¶ 33 Respondent argues the trial court placed too much emphasis on C.R.'s sense of attachment and his need for permanence. Respondent further argues the court placed too little weight on C.R.'s relationship with respondent. We disagree with respondent. As evidenced by the trial court's lengthy ruling, it adequately weighed all the relevant statutory best-interest factors and properly determined the factors weighed in favor of terminating respondent's parental rights.

¶ 34 The trial court carefully considered the statutory factors and determined respondent failed to provide for C.R.'s safety and welfare for more than two years during the pendency of the case. The court noted C.R. had bonded with his foster family and had negative responses when he was away from the foster placement. The court found the foster placement to be a stable, secure environment.

¶ 35    As to the development of the child's identity, the trial court stated individuals other than respondent had a hand in developing C.R.'s identity. The court noted C.R. was three and a half years old and had been allowed to be a child during the previous six months he lived with his foster placement. As to the child's familial, cultural, and religious background and ties, the court found the factor to be neutral given C.R.'s young age. The court noted respondent clearly loved C.R. but was unable to meet his needs as well as her own needs. Although defendant asserts the court failed to give C.R.'s relationship with respondent adequate weight, the court noted respondent wanted to care for C.R. and did not want him to feel she gave up on him. But the court noted that sense of attachment must be weighed against the fact that she was unable to meet his needs. Ultimately the court found this factor weighed in favor of termination. The court found the foster family provided the minor with love, attachment, and consistency.

¶ 36    The trial court declined to consider the child's wishes and long-term goals due to C.R.'s young age. The court found the minor's community ties to be a neutral factor based on C.R.'s age but noted that he may be developing those attachments attending preschool. The court found the risk of remaining in substitute care weighed in favor of termination because C.R. had spent two-thirds of his life in care with multiple placements. The court noted the current placement offered permanency, which supported terminating respondent's rights. Respondent was unable to offer C.R. permanency after more than two years of being involved with services.

¶ 37    Our review of the trial court's best interest finding indicates the court carefully considered each factor and did not give any one factor undue weight. Although the court emphasized C.R.'s need for permanence and stability, it did not give this factor excessive weight. Accordingly, we find the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence. Therefore, we affirm the court's judgment.

¶ 38                                    III. CONCLUSION

¶ 39          For the foregoing reasons, we affirm the trial court's judgment.

¶ 40          Affirmed.